UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
THE CLEARING HOUSE                          :
ASSOCIATION, L.L.C.                         :         05 Civ. 5629 (SHS)
                        Plaintiff,          :
            -against-                       :         OPINION AND ORDER
                                            :
ELIOT SPITZER, in his official capacity as  :
Attorney General for the State of New York, :
                                            :
                        Defendant.          :
------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

      The Clearing House Association, L.L.C., (the "Clearing House"), brings this action against Eliot Spitzer, the Attorney General of the State of New York to enjoin him from instituting enforcement actions or investigating the Clearing House's national bank members and their operating subsidiaries relating to their residential mortgage lending practices. The Clearing House contends that the Attorney General's investigation and threatened enforcement actions impinge on the exclusive visitorial powers of the Office of the Comptroller of the Currency (the "OCC") in violation of section 484(a) of the National Bank Act, 12 U.S.C. § 484(a), and the OCC's regulation interpreting that provision, codified at 12 C.F.R. § 7.4000.

      The bulk of the issues raised by the Clearing House's application for injunctive relief have been resolved in the opinion issued today in the related action of The Office of the Comptroller of the Currency v. Spitzer, No. 05 Civ. 5636, ("OCC v. Spitzer"). In OCC v. Spitzer, this Court, applying the framework set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), concluded that 12 C.F.R. § 7.4000 reflects a reasonable and permissible construction of the National Bank Act. (See Opinion and Order in OCC v. Spitzer, dated October 12, 2005). Because the Attorney

1

General's assertion of authority pursuant to state law to investigate and bring enforcement actions related to the residential lending practices of national banks impermissibly infringes on the OCC's exclusive visitorial authority as defined in 12 C.F.R. § 7.4000, this Court granted the OCC's application for declaratory and permanent injunctive relief against the Attorney General.

In this action, the Clearing House seeks an additional measure of relief based on the Attorney General's assertion that 42 U.S.C. § 3613(a), the civil enforcement provision of the federal Fair Housing Act, (the "FHA"), authorizes the Attorney General to sue national banks in the state's parens patriae capacity for alleged violations of the FHA's fair lending provisions. Because an action in the state's parens patriae capacity to enforce the FHA's fair lending provisions against the Clearing House national bank members constitutes a form of visitorial authority prohibited by section 484(a) of the National Bank Act, and is not expressly authorized by the FHA, the Clearing House is entitled to the injunction it seeks.

**I.      Background**

The Court assumes familiarity with its opinion issued today in OCC v. Spitzer, No. 05 Civ. 5636 (SHS), and limits the discussion here to issues not raised directly in OCC v. Spitzer. Indeed, this opinion need be read in conjunction with that one. The Court writes separately to address issues regarding the Clearing House's ability to bring its claim in federal court, and to answer the question raised only by the Clearing House of whether the Attorney General should be enjoined from bringing an action in the state's parens patriae capacity to enforce the federal Fair Housing Act against national banks.

The Clearing House commenced this action on June 16, 2005 seeking to enjoin the Attorney General from issuing subpoenas for information concerning, or taking any other action

2

to enforce federal and state discrimination in lending laws against the national banks that are members of the Clearing House, with respect to their mortgage lending operations. OCC v. Spitzer was accepted as a related case, and pursuant to Fed. R. Civ. P. 65(a)(2), the trials on the merits in this action and OCC v. Spitzer were consolidated with the hearings on the preliminary injunction applications. (Order, dated July 5, 2005). The trial in both actions was held on September 7, 2005, and at that time, argument was heard and affidavits and other exhibits were admitted into evidence. (Transcript, dated Sept. 7, 2005, at 36-37).

The Clearing House Association, L.L.C., is an association of commercial banks, including federally chartered national banks. (See Declaration of Norman R. Nelson, Esq., dated June 15, 2005 at ¶¶ 1-3). The Clearing House describes itself as dedicated to protecting the rights and interests of its member banks as well as advancing the broader interests of the domestic commercial banking industry. (Id. at ¶¶ 2, 4). The Clearing House states that it is "interested in ensuring stability and certainty in the regulatory environment in which its member banks operate." (Id. at ¶ 4). At least four of the Clearing House's national bank members or their operating subsidiaries – Citibank, N.A., Wells Fargo Bank, N.A., HSBC Bank U.S.A., N.A., and JPMorgan Chase Bank, N.A. – are subjects of the inquiry initiated by the Attorney General and have received requests for certain non-public lending information. (See Nelson Decl. at ¶¶ 7-8; Declaration of Dennis D. Parker in Supp. of Def.'s Opp to Pls.' Request for Injunctive and Declaratory Relief and in Supp. of Counterclaim, dated August 5, 2005, ("Parker Decl."), at ¶ 4-5, and Ex. 2).

As recounted in the related action, a preliminary analysis by the Attorney General of home loan pricing data made publicly available pursuant to the federal Home Mortgage Disclosure Act, 12 U.S.C. §§ 2801 – 2810, led the Attorney General to conclude that the data

established a prima facie case of race discrimination in violation of federal and state fair lending laws. (See Parker Decl., at ¶¶ 4-5). In letters to HSBC, Wells Fargo and JP Morgan Chase, the Attorney General informed the banks that he had commenced a preliminary inquiry into each bank's lending practices, and requested that "[i]n lieu of issuing a formal subpoena …" the banks "voluntarily provide" certain non-public lending information. (See Letters from Dennis D. Parker, dated April 19, 2005, Ex 2 to Parker Decl.).

In his opposition to the Clearing House's application for injunctive relief, the Attorney General asserted that the FHA creates a federally authorized exception to section 484's general limitation on states' visitorial powers. See 12 U.S.C. § 484(a) (limiting the exercise of visitorial powers, "except as authorized by Federal law . . ."). Specifically, the Attorney General contends that the FHA's private right of action provision, 42 U.S.C. § 3613(a) – which authorizes suits by an "aggrieved person" – permits the state to sue national banks both in its parens patriae capacity, and on its own behalf, claiming injury to its proprietary interests.

Because the injunction issued in OCC v. Spitzer applies by its terms to all national banks and their operating subsidiaries, it clearly encompasses the national bank members of the Clearing House on whose behalf the Clearing House seeks injunctive relief. The single outstanding issue on the merits of the Clearing House's application is whether the Attorney General's threatened action pursuant to the Fair Housing Act, is also prohibited by section 484's limitation on states' visitorial authority, or whether such an action would fall within an exception "authorized by Federal law."

Because the Attorney General has challenged the Clearing House's ability to bring this claim in federal court, the Court turns first to the questions of whether federal subject matter

4

jurisdiction exists, and whether the Clearing House has standing to bring this action, and answers each question in the affirmative.

## II. Subject Matter Jurisdiction

The Clearing House contends that subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 because this action arises under the National Bank Act, 12 U.S.C. §§ 21, et seq., asserting that "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." Fleet Bank, Nat. Ass'n v. Burke, 160 F.3d 883, 888 (2d Cir. 1998) (citing Ex parte Young, 209 U.S. 123, 160-62, 28 S. Ct. 441, 52 L. Ed. 714 (1908)).

The Attorney General responds by claiming that the Clearing House's complaint is one that merely anticipates a federal defense that would be filed in answer to a potential state court action brought by the Attorney General, and thus lacks federal jurisdiction under what is known as the "well-pleaded complaint" rule. See Fleet Bank, 160 F.3d at 886. However, the U.S. Supreme Court has long made it clear that actions such as this one that seek to enjoin state officials from interfering with federal rights present a federal question over which federal courts have jurisdiction. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96, n.14, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983) (citing Ex parte Young, 209 U.S. 123, 160-62, 52 L. Ed. 714, 28 S. Ct. 441 (1908)); see also Verizon Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 642, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002). The rule was stated most plainly in Shaw as follows:

> It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. See Ex parte Young, 209 U.S. 123, 160-62, 52 L. Ed. 714, 28 S. Ct. 441 (1908). A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

5

Shaw, 463 U.S. at 96 n.14 (internal citations omitted); see also Verizon, 535 U.S. at 642 (there is "no doubt that federal courts have jurisdiction under § 1331" over an action seeking declaratory and injunctive relief against state officials on the grounds that a state regulation was preempted by federal law).

While it is true that the Clearing House's claims might be raised as defenses in a claim brought in a state court action by the state Attorney General, "a properly framed federal cause of action does not fall outside § 1331 simply because it could also arise as an affirmative federal defense in state court." Aroostook Band of Micmacs v. Ryan, 404 F.3d 48, 61 (1st Cir. 2005) (emphasis in original). In any event, the sole issue that remains to be resolved in this action is the Clearing House's request for injunctive relief enjoining the Attorney General from bringing an action pursuant to the federal Fair Housing Act, thus even looking to the character of the anticipated claim to determine whether it would present a federal question, the well-pleaded complaint rule is satisfied. See Public Service Comm'n v. Wycoff Co., 344 U.S. 237, 248, 73 S. Ct. 236, 97 L. Ed. 291 (1952) ("Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court."); see also Fleet Bank, 160 F.3d at 886. Because the Clearing House seeks injunctive relief from the Attorney General's threatened enforcement action on the ground that such action is prohibited by federal law, it has presented a federal question over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 to resolve.

### III. Standing

The Clearing House asserts that it has standing to bring this action on behalf of its members pursuant to a judicially created concept known as associational standing. The

applicable test for associational standing is set forth in Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977). See N.Y. Pub. Interest Research Group v. Whitman, 321 F.3d 316, 325 (2d Cir. 2003). As explicated in Hunt,

> An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Hunt, 432 U.S. at 343. To meet the first prong of this test, the Clearing House must establish that its members satisfy the three elements comprising the "irreducible constitutional minimum of standing" required by Article III of the U.S. Constitution. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); see also N.Y. Pub. Interest Research Group, 321 F.3d at 325. First, the member banks "must have suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560-61.

As described above, four Clearing House member banks have been threatened with the state's assertion of authority to sue to compel the national banks' compliance with laws governing their federally authorized banking activities. "When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be . . . proved . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action . . . at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will

7

redress it." Lujan, 504 U.S. at 561-562. The member banks are the direct targets of the Attorney General's threatened enforcement actions, and an injunction would protect those banks from the allegedly unlawful intrusion into their federally authorized banking operations.

The threat of litigation in this case is not merely conjectural or hypothetical. See O'Shea v. Littleton, 414 U.S. 488, 496-97, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974). The Attorney General has informed specific member banks as well as this Court that the mortgage pricing data from four Clearing House member banks was, he believes, "sufficient to establish a prima facie case of discrimination on the basis of race under both federal and state fair lending laws." (Parker Decl. at ¶¶ 4-5; Letters from Dennis Parker, dated April 19, 2005, Ex. 2 to Parker Decl.). At the trial of this action, the Attorney General's attorney stated that the Attorney General intended to proceed with the investigation and enforcement actions in the absence of an injunction. (Transcript, dated Sept. 7, 2005, at 38). Accordingly, the Clearing House has established that its members would have standing to sue in their own right, thus meeting the first prong of the Hunt test.

The Clearing House also meets the second and third prongs of the Hunt test. The interests the Clearing House seeks to protect, particularly its members' interest in being free from the burden of complying with state regulatory and enforcement efforts allegedly taken in violation of section 484 of the National Bank Act, and its members' interest in certainty in their regulatory environment, are the type of interests that are "germane to the [Clearing House's] purpose." Hunt, 432 U.S. at 343; (See Nelson Decl. at ¶¶ 3-4). Finally, the participation of the individual members is not required either to establish the fact or extent of the threatened injury; the Attorney General's assertion that the available data establishes a prima facie case of prohibited discrimination was asserted without distinction between the national banks that are the

focus of his inquiry. (See Parker Decl. at ¶¶ 4-5). The Clearing House seeks only injunctive relief that "'will inure to the benefit of those members of the association actually injured.'" Bano v. Union Carbide Corp., 361 F.3d 696, 714 (2d Cir. 2004) (quoting Warth v. Seldin, 422 U.S. 490, 515, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)); see also International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock, 477 U.S. 274, 287-88, 106 S. Ct. 2523, 91 L. Ed. 2d 228 (1986).

Accordingly, the Clearing House meets the test the Supreme Court set forth in Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977) for associational standing; it therefore has standing to bring this action as a representative of its member banks.

## VI. Discussion

The Clearing House contends that section 484(a) of the National Bank Act, 12 U.S.C. § 484(a), as clarified by 12 C.F.R. § 7.4000, bars the Attorney General from bringing an action pursuant to the Fair Housing Act in which he would assert standing in the state's parens patriae capacity. Section 484(a) provides:

> No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress . . .

12 U.S.C. § 484(a). Here, the Attorney General asserts that he is "authorized by Federal law," specifically by the civil enforcement provision of the Fair Housing Act, 42 U.S.C. § 3613(a)(1)(A), to bring an action to enforce that Act's fair lending provisions against national banks in the state's parens patriae capacity.[1]

---

[1] The Attorney General briefly asserts that he has the authority to bring an action claiming injury to the state's proprietary interests as well as in the state's parens patriae capacity. However, not only does such a claim raise constitutional standing issues, but plaintiff here seeks only an injunction addressed to a parens patriae suit. Rather

9

The question that this Court must answer therefore, is whether a parens patriae action constitutes visitation for purposes of 12 U.S.C. § 484(a), and if so, whether Congress intended to create an exception to the limitation on state visitorial power by permitting states to bring parens patriae actions to enforce the FHA's fair lending provisions against national banks. See Hawaii v. Standard Oil Co. of California, 405 U.S. 251, 259, 92 S. Ct. 885, 31 L. Ed. 2d 184 (1972); see also Connecticut v. Physicians Health Servs. of Conn., Inc., 287 F.3d 110, 120-21 (2d Cir. 2002). In answering that question, the Court first outlines briefly the nature of parens patriae actions and considers whether they constitute a form of visitation for purposes of the National Bank Act. The Court then considers whether the FHA, viewed in light of the National Bank Act's prohibition on state visitorial authority, evinces a Congressional intent to permit states to bring parens patriae actions to enforce the FHA's fair lending provisions against national banks.

### A. A Parens patriae Action Is a Form of Visitation

In Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 600, 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982), the Supreme Court explained the history of the parens patriae doctrine pursuant to which a state may bring suit on behalf of its citizens asserting injury to a "quasi-sovereign interest," which is a "judicial construct that does not lend itself to a simple or exact definition." Id. at 601. As set forth in Snapp, the parens patriae doctrine, which has its roots in the principle that a sovereign, as "parent of the country," may step in on behalf of its citizens to prevent "injury to those who cannot protect themselves," has developed in American law into a concept that "does not involve the States stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves. In fact, if nothing more than this is involved--i.e., if the State is only a nominal party without a real interest of its

---

than analyze a conjectural claim asserting potential proprietary interests, this Court will address solely the question of whether an injunction is appropriate to bar a parens patriae litigation.

own--then it will not have standing under the parens patriae doctrine." Id. at 600. Although Snapp did not precisely define the parameters of a state's quasi-sovereign interests, it explained that they do encompass a state's interests in the "well-being of its populace." Id. at 602. In line with these principles, when a state seeks to establish standing to sue in its parens patriae capacity, it must: (1) "allege[] injury to a sufficiently substantial segment of its population;" (2) "articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party;" and must (3) "express a quasi-sovereign interest." Id. at 607. Additionally, the U.S. Court of Appeals for the Second Circuit has required that in order to support parens patriae standing, a state must demonstrate that it is acting on behalf of its citizens where individuals could not obtain complete relief through a private suit. People of the State of New York v. 11 Cornwell Co., 695 F.2d 34, 40 (2d Cir.1982), vacated in part on other grounds, 718 F.2d 22 (2d Cir.1983) (en banc).

Because states must invoke a quasi-sovereign authority in order to establish parens patriae standing, a parens patriae action is a form of visitation, and is prohibited by section 484(a) of the National Bank Act, as interpreted by 12 C.F.R. § 7.4000, unless Congress intended to provide otherwise. See Guthrie v. Harkness, 199 U.S. 148, 158-59, 26 S. Ct. 4, 50 L. Ed. 130 (1905); see also Banking Activities and Operations, 69 Fed. Reg. 1895, 1899 (Jan. 13, 2004) ("private civil cases in pursuit of personal claims against national banks, . . . unlike attempts by state authorities to exercise authority over national banks using the courts, do not amount to visitations").

### B. The Fair Housing Act Does Not Permit Parens Patriae Actions Otherwise Barred by Section 484 of the National Bank Act

The FHA prohibits "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available

such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a). Real estate-related transactions for the purposes of the Act include making or purchasing loans for the purchase, construction, improvement, repair, or maintenance of a dwelling, and making or purchasing loans "secured by residential real estate." 42 U.S.C. § 3605(b)(1)(A) and (B). The FHA establishes several means of enforcing these provisions and the other anti-discrimination provisions in the Act, including administrative enforcement by the U.S. Secretary of Housing and Urban Development; administrative enforcement by certified state or local agencies; private causes of action by aggrieved persons; and civil enforcement by the U.S. Attorney General where that federal official discerns a "pattern and practice" of violations. See 42 U.S.C. §§ 3610, 3610(f), 3613(a), 3614. The parties to this litigation agree that the New York State Attorney General is not a certified state agency for these purposes.

The Attorney General asserts the authority to regulate the mortgage lending activities of the national banks through litigation brought in the state's parens patriae capacity pursuant to 42 U.S.C. § 3613, which is part of the Fair Housing Act, entitled, "Enforcement by private persons." That section grants an "aggrieved person" the right to bring an action for appropriate relief from an alleged discriminatory housing practice. 42 U.S.C. § 3613(a)(1)(A). The FHA defines an "aggrieved person" as "any person who--(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 USCA § 3602(i).

This grant of standing to any "aggrieved person" is the type of statutory language cited by the Second Circuit as that which is generally interpreted to reflect Congressional intent to permit states to enforce the rights protected by federal statutes through parens patriae actions.

See Connecticut v. Physicians Health Services of Connecticut, Inc., 287 F.3d 110, 121 (2d Cir. 2002) ("Physicians Health Services") ("'the federal statutes under which states have been granted parens patriae standing all contain broad civil enforcement provisions that permit suit by any 'person' that is 'injured' or 'aggrieved.'") (quoting Connecticut v. Physicians Health Services of Connecticut, Inc.,103 F. Supp. 2d 495, 509-10 (D. Conn. 2000) (citing, inter alia, 42 U.S.C. § 3613(a)(1)(A)); see also Support Ministries for Persons With AIDS v. Village of Waterford, 799 F. Supp. 272, 277 (N.D.N.Y. 1992) (concluding that New York alleged sufficient injury to its quasi-sovereign interest in the health and well-being of its citizens to maintain a parens patriae action challenging an allegedly discriminatory denial of building permits for a facility for persons living with AIDS as violative of the FHA, the Fourteenth Amendment, and state and local anti-discrimination laws).

However, just as the Supreme Court found in Hawaii v. Standard Oil Co. of California, 405 U.S. 251, 259, 92 S. Ct. 885, 31 L. Ed. 2d 184 (1972), the question of whether the Attorney General may bring a parens patriae action against national banks to enforce the FHA's fair lending provisions is a question that "cannot be resolved simply by reference to any general principles governing parens patriae actions." Id. at 259.

In Hawaii v. Standard Oil Co. of California, the Supreme Court was faced with the question of whether a state could bring a parens patriae action seeking monetary damages – as opposed to injunctive relief – based on injury to its quasi-sovereign interests pursuant to federal antitrust laws. See 405 U.S. at 260-61. The Court considered the federal statutory scheme, its legislative history, and the practical impact of allowing parens patriae actions. The Court concluded that, in light of the absence of an express provision in the statutory text permitting parens patriae actions, Congress did not intend to permit states to recover monetary damages for

alleged harm to their quasi-sovereign interests. See id. at 263-66. Congress responded to that decision and subsequently amended the law to explicitly permit parens patriae suits by states seeking monetary damages. See New York ex rel Vacco v. Reebok International Limited, 96 F.3d 44, 46 (2d Cir. 1996); see also 15 U.S.C. § 15c(a)(1) ("Any attorney general of a State may bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any district court of the United States having jurisdiction of the defendant, to secure monetary relief as provided in this section for injury sustained by such natural persons to their property by reason of any violation of sections 1 to 7 of this title.").

In Physicians Health Services, the Second Circuit similarly sets forth that in determining whether a state may assert parens patriae standing pursuant to a particular federal statutory provision, a court's task is to discern whether "Congress intended to allow for such standing." See 287 F.3d at 120-21. This analysis begins with a consideration of the relevant statutory scheme, including what types of enforcement mechanisms are – and are not – expressly provided for by Congress. See id. In Physicians Health Services, finding that ERISA's carefully drawn limitations on parties authorized to sue did not include an express provision for suits by states, the Second Circuit concluded that Congress did not intend to permit parens patriae suits by states, and thus held that Connecticut lacked statutory standing to bring an action on behalf of the state's citizens challenging an insurance company's use of a drug formulary system. Id. at 121.

Here, when the broad enforcement provisions of the FHA are read in conjunction with section 484 of the National Bank Act, the absence of any express provision in the Fair Housing Act authorizing states to bring parens patriae actions against national banks leads to the conclusion that Congress did not intend, in granting any "aggrieved person" a private right of

action, to implicitly override section 484's limitation on the powers of states to exercise visitorial powers over national banks.

Section 484 of the National Bank Act, as interpreted by the OCC, prohibits states from: "[e]nforcing compliance with any applicable federal or state laws concerning" the "activities authorized or permitted pursuant to federal banking law." See 12 C.F.R. §§ 7.4000(a)(2)(iii) and (iv). The OCC has read the exceptions to section 484's limitation on states' visitorial powers narrowly, reasoning that Congress intended to create a system of national banks protected from intrusive state regulation. See Banking Activities and Operations, 69 Fed. Reg. 1895, 1900 (Jan. 13, 2004). In considering whether 42 U.S.C. § 3613(a)(1)(A) evinces an intent by Congress to create an exception to the limitation on state visitorial powers, it is helpful to contrast the FHA provision at issue here with instances where Congress has indisputably created exceptions for state visitation over national banks.

In each of the exceptions noted in 12 C.F.R. § 7.4000(b)(1) in which Congress has created exceptions authorizing states to exercise visitorial authority over national banks, it has done so explicitly, carefully defining the parameters of the states' authority. See 12 U.S.C. § 484(b) ("Notwithstanding subsection (a) of this section, lawfully authorized State auditors and examiners may, at reasonable times and upon reasonable notice to a bank, review its records solely to ensure compliance with applicable State unclaimed property or escheat laws upon reasonable cause to believe that the bank has failed to comply with such laws."); see also Federal Unemployment Tax Act, 26 U.S.C. § 3305(c) ("Nothing contained in [12 U.S.C. 484], shall prevent any State from requiring any national banking association to render returns and reports relative to the association's employees, their remuneration and services, to the same extent that other persons are required to render like returns and reports under a State law requiring

15

contributions to an unemployment fund"). Each of these exceptions to the rule limiting states' visitorial authority is explicit, narrowly drawn, and carves out an exception pertaining to non-banking activities.

In contrast, the FHA neither explicitly includes states in its definition of "aggrieved persons" nor explicitly grants states the authority to bring actions in their parens patriae capacity. It does grant the U.S. Attorney General the authority to institute civil actions where there is a pattern and practice of violations, see 42 U.S.C. § 3614, but fails to extend similar authority to states. It directs the U.S. Secretary of Housing and Urban Development to refer administrative complaints to state or local agencies that have been certified as providing substantially equivalent protections, see 42 U.S.C. § 3610(f), but, as noted, the parties agree that that carefully crafted certification and referral mechanism does not provide the basis for the Attorney General's threatened action. Finally, section 3608(d) reveals that Congress was cognizant of the role of federal banking regulators when it enacted the enforcement provisions of the FHA, see 42 U.S.C. § 3608(d), yet there is no provision expressly creating an exception to section 484 of the National Bank Act to permit states to enforce the FHA's fair lending provisions against national banks.

In light of the several carefully drawn enforcement provisions in the FHA, the explicit exceptions in other instances where Congress clearly intended to permit states to exercise visitorial authority over national banks, and the lack of any similar grant of authority for states to bring parens patriae actions pursuant to the FHA's private right of action provision, the Court concludes that 42 U.S.C. § 3613(a) does not reflect an intent by Congress to authorize states to bring parens patriae actions against national banks to enforce the FHA's fair lending provisions. See Physicians Health Services, 287 F.3d at 121 (citing Great-West Life & Annuity Ins. Co. v.

Knudson, 534 U.S. 204, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002) ("ERISA's carefully crafted and detailed enforcement scheme provides strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly.") (emphasis, citations, and internal quotation marks omitted)).

        C.     **Permanent Injunctive Relief Is Warranted**

The Attorney General correctly asserts that in order to warrant the requested injunctive relief, the Clearing House must establish that it is threatened with an injury for which there is no adequate remedy at law. The Supreme Court has repeatedly explained that "[i]t is a 'basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.'" Morales v. Trans World Airlines, 504 U.S. 374, 381, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992) (quoting O'Shea v. Littleton, 414 U.S. 488, 499, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974)); see also Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982).

Where it is established that a state's threatened action would violate a federal statute, and an injunction is necessary in order to protect the "underlying substantive purpose" of that statute, injunctive relief may be granted. See Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 544, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987); see also Jennings Water, Inc. v. City of North Vernon, Ind., 895 F.2d 311, 318, n.6 (7th Cir. 1989).

Here, the Clearing House seeks an injunction barring the state from precisely the type of interference with national banks that section 484 of the National Bank Act is intended to prohibit. See Wells Fargo v. Boutris, 265 F. Supp.2d 1162, 1178-79 (E.D. Cal. 2003) (granting permanent injunction barring state regulation of national bank's operating subsidiary), aff'd in part and reversed in part on other grounds, 419 F.3d 949 (9th Cir. 2005); see also First Union

Nat'l Bank v. Burke, 48 F. Supp. 2d 132, 150-51 (D. Conn. 1999) (granting the OCC's motion for preliminary injunction on showing that threatened state regulation of national banks was likely prohibited by 12 C.F.R. § 484(a)). Accordingly, the Clearing House is entitled to the injunctive relief provided in OCC v. Spitzer as well as the additional measure of injunctive relief enjoining the threatened parens patriae actions that has not already been provided in OCC v. Spitzer.

## V. Conclusion

For the reasons set forth above, the Clearing House's application for permanent injunctive relief is granted. Plaintiff is entitled to the injunctive relief provided in OCC v. Spitzer for the reasons set forth in the Opinion and Order in that action dated October 12, 2005. In addition, because an action brought in the state's parens patriae capacity to enforce the Fair Housing Act's fair lending provisions against the Clearing House national bank members or their operating subsidiaries constitutes a form of visitorial authority prohibited by section 484(a) of the National Bank Act, and is not authorized by federal law, the New York State Attorney General is enjoined from instituting any judicial action premised on the state's parens patriae authority to enforce the Fair Housing Act's fair lending provisions against the Clearing House's national bank members or their operating subsidiaries.

Dated: New York, New York
October 12, 2005

SO ORDERED:

_/s/ Sidney H. Stein_
Sidney H. Stein, U.S.D.J.